# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# at KNOXVILLE

| | |
|---|---|
| MARCUS D. BLAKEMORE, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | Case No. 3:17-cv-458 |
| v. ) | |
| ) | Chief Judge Pamela L. Reeves |
| JEFF ROBERSON, ) | Magistrate Judge Guyton |
| ) | |
| *Defendant*. ) | |
| ) | |

## ORDER

Before the Court is Defendant's Motion for Summary Judgment (Doc. 14), seeking dismissal of Plaintiff's claims for false arrest, malicious prosecution, and false imprisonment arising out of his arrest by Defendant for boating under the influence in violation of Tennessee Code Annotated § 69-6-217. Defendant argues he had probable cause to arrest Plaintiff and is entitled to qualified immunity because his actions were objectively reasonable under the circumstances. Genuine issues of material fact preclude summary judgment in this matter and the Motion (Doc. 14) will be denied.

## I.    FACTUAL AND PROCEDURAL HISTORY

On September 24, 2016, Plaintiff, Marcus Blakemore, and his wife, Heather Blakemore, attended a cookout/tailgating event at the marina outside Neyland Stadium. (Doc. 19-5 at 18-19; Doc. 19-7 at 6-7). The cookout began sometime prior to the football game, which was televised at 3:30 p.m. E.S.T. (Doc. 19-2 at 1; Doc. 19-5 at 19). At the cookout, Plaintiff consumed two beers. (Doc. 19-5 at 12). In the evening, Plaintiff, Mrs. Blakemore, and their friend, Tommy Wykle, decided to take Wykle's boat out because it was a nice night. (Doc. 19-5 at 11-12). Though the

exact time of their departure is not clear, it was dark and appears to have been around 8:00 p.m. (Doc. 14-5 at 3; Doc. 19-7 at 7; Doc. 19-11 at 2). Wykle pulled the boat out of the slip, and Plaintiff drove the boat into the channel. (Doc. 14-5 at 3-4; Doc. 19-5 at 13). Shortly after the boat left the marina, it was pulled over by Tennessee Wildlife Resources Agency officers Greg Julian and Jeff Roberson. (Doc. 19-5 at 13-14; Doc. 14-5 at 4; Doc. 19-11). One or both of the officers observed a starboard navigational light out on Wykle's boat and initiated the stop with flashing blue lights. (Doc. 14-3 at 9; Doc. 19-11 at 2). While Officer Julian piloted the patrol boat, Defendant indicated to the occupants of Wykle's boat that a navigational light was out. (Doc. 19-5 at 14; Doc. 14-3 at 11). Plaintiff or Wykle had checked all the lights prior to leaving the dock, and they appeared to be working properly. (Doc. 14-5 at 3; Doc. 19-5 at 14). They tried to correct the light issue, but the light did not turn back on. (Doc. 14-3 at 11-12; Doc. 14-5 at 4).

From his position on the patrol boat, Defendant says he saw "several open containers" on Wykle's boat and detected an odor of alcohol coming from the boat. (Doc. 19-10 at 3, 6-7). He noticed a clear glass on the dash in the operator's area, which to him "appeared to be an alcoholic beverage." (Doc. 19-10 at 7, 31). In his testimony, Defendant recalled it was a brownish liquid. (Doc. 19-10 at 31). The bodycam footage of the incident shows it was clear liquid or ice. (Doc. 20, at 20:16). Plaintiff avers the glass contained water. (Doc. 19-1 at 1). Though there was nothing about the way the boat was being operated that indicated the driver was boating under the influence of an intoxicant, Defendant testified that "every stop is a BUI investigation until evidence shows otherwise." (Doc. 19-10 at 6).

Defendant then indicated he would be conducting a safety inspection, boarded Wykle's boat, and asked the occupants to produce life jackets. (Doc. 19-5 at 14, Doc. 14-5 at 5). The bodycam footage begins aboard Wykle's boat. (Doc. 20). Plaintiff went down in the cabin of the

boat, with Wykle directing him as to the location of the life jackets. (*Id.* at 20:15). Plaintiff produced the life jackets and returned to the deck. (*Id.*). As Plaintiff walked up the stairs, Defendant asked Plaintiff if he had been drinking. (*Id.* at 20:17). Plaintiff indicated he had two beers earlier. (*Id.*). Defendant asked if that was all, and Plaintiff confirmed it was. (*Id.*). Defendant then asked Plaintiff to say the alphabet without singing and count backwards from 89 to 65. (*Id.* at 20:17 to 20:19). Plaintiff did so but not to Defendant's satisfaction. (Doc. 19-10 at 19, 21). According to Defendant, Plaintiff sang the alphabet and repeated several letters; in counting, he hesitated on a few numbers and continued past 65. (*Id.*). Though he was quite close to it at times, Defendant did not investigate the glass, ask what it was, test it, or make any effort to determine what it contained. (Doc. 19-10 at 7, 28-31; Doc. 20 at 20:15).

Defendant then asked Plaintiff to put on a life jacket and directed Plaintiff to his patrol boat. (Doc. 19-10 at 23; Doc. 20 at 20:19, 20:22; Doc. 14-5 at 5). On the patrol boat, Defendant conducted four seated field sobriety tests: Horizontal Gaze Nystagmus ("HGN"), Finger to Nose, Palm Pat, and Hand Coordination. (Doc. 19-10 at 32, 35, 36, 38). In Defendant's estimation, Plaintiff failed the first three tests by exhibiting sufficient "clues" to indicate impairment and passed the final test. (Doc. 19-10 at 52; Doc. 19-11 at 4-5). During the tests, the flashing lights of the patrol boat appear to have remained on. (Doc. 20 at 20:23). The boat visibly rocks and the sound of motors and sirens can be heard in the background during or between several tests. (*Id.* at 20:25, 20:26, 20:27). Plaintiff, a large man, appears to clasp the seat on either side while the boat rocks after the HGN test and again after the Hand Coordination test. (*Id.* at 20:26; 20:32).

Defendant did not discuss the results of the test with Plaintiff. (*Id.*). He again asked Plaintiff whether he in fact had only had two beers, referencing liquor he may have seen on the boat. (*Id.* at 20:32). Plaintiff confirmed he had only two and indicated it was during the football game, around

halftime. (*Id.*). The game was televised beginning at 3:30 p.m. E.S.T., approximately five hours earlier.

Defendant then asked Plaintiff for some personal information, chatting and commenting on Plaintiff's impressive level of education while he filled out a form. (Doc. 20 at 20:33-20:34). Plaintiff appears visibly more relaxed and answers Defendant's questions. (*Id.*). Defendant still did not inform Plaintiff that he had failed the tests or that he was under arrest. (*Id.*). Defendant then told Plaintiff he was going to read a form aloud and give Plaintiff the option to sign it. (Doc. 20 at 20:38). He read aloud the BUI Implied Consent Form, which reads in part: "There are reasonable grounds to believe that you were operating or in physical control of a vessel while under the influence of alcohol and/or drugs. You are under arrest and I request that you submit to a test to determine your alcohol and/or drug level." (*Id.*).

When Plaintiff hears the word "arrest," the video shows him lean forward to listen more intently, looking confused. (*Id.*). Defendant then hands Plaintiff the BUI Implied Consent Form and explains he is asking for a blood alcohol sample, so Blakemore needs to check whether he will submit or not. (*Id.*). Blakemore takes the form and says yes, he has no problem with it. (*Id.*). He holds the pen as if to sign the form and then pauses, looks up and says "You said I'm under arrest?" (*Id.*). Defendant says yes. (*Id.*).

Thereafter, Plaintiff was handcuffed and transported to Knox County jail. (Doc. 19-10 at 34, 42). A blood sample was taken, which came back negative for alcohol and basic drugs. (Doc. 19-11 at 7-8). After all charges against him were dropped, Blakemore sued Officer Roberson in Knox County Circuit Court for false arrest, malicious prosecution, and false imprisonment. (Doc. 1 at 8-13). Defendant removed the action to this Court on the basis of the Fourth and Fourteenth Amendment claims. (Doc. 1 at 1). Defendant now moves for summary judgment as to all of

Plaintiff's claims based on the assertion that he acted with probable cause and is entitled to qualified immunity because his actions were objectively reasonable under the circumstances. (Doc. 14, Doc. 15). Blakemore maintains that genuine issues of material fact as to probable cause and qualified immunity preclude summary judgment for Defendant. (Doc. 19).

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). But, where there is "'a videotape capturing the events in question,' the court must 'view the facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 378-81 (2007).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may

discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248-49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## III. ANALYSIS

Plaintiff brings suit pursuant to 42 U.S.C. § 1983 for violation of his Fourth and Fourteenth Amendment rights, asserting claims for false arrest, false imprisonment, and malicious prosecution. "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States." *Green*, 681 F.3d at 860.

To succeed on a malicious prosecution claim under § 1983 based on a Fourth Amendment violation, a plaintiff must prove the following:

6

> First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute. Second . . . the plaintiff must show that there was a lack of probable cause for the criminal prosecution. Third, the plaintiff must show that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty . . . apart from the initial seizure. Fourth, the criminal proceeding must have been resolved in the plaintiff's favor.

*Sykes v. Anderson*, 625 F.3d 294, 308-9 (6th Cir. 2010). Plaintiff's false imprisonment claim arises out of his alleged false arrest, so the elements of these causes of action are the same in this case. *Corvin v. Bice*, No. 1:05-cv-219, 2007 WL 776501, *4 (E.D. Tenn. March 9, 2007) (considering federal false imprisonment and false arrest claims); *Lee v. Ritter*, No. 1:02-CV-282, 2005 WL 3369616, *20, (E.D. Tenn. Dec. 12, 2005) (considering Tennessee common law claims). To prove false arrest, Plaintiff must show the arresting officer lacked probable cause to arrest him. *Shearon v. Womack*, No. 3:15-cv-01061, 2017 WL 5126180, *3 (M.D. Tenn. Nov. 3, 2017).

A claim for false arrest under Tennessee law[1] has two elements: the detention or restraint of one against his will and the unlawfulness of such detention or restraint. *Newsom v. Thalhimer Bros., Inc.*, 901 S.W.2d 365, 367 (Tenn. Ct. App. 1994). To prevail on a claim for malicious prosecution in Tennessee, a plaintiff must prove: (1) a prior suit or judicial proceeding was instituted without probable cause; (2) defendant brought the prior action with malice; and (3) the prior action was finally terminated in the plaintiff's favor. *Shearon v. Womack*, 2017 WL 5126180 at *3 (citing *Roberts v. Fed. Express Corp.*, 842 S.W.2d 246, 247-48 (Tenn. 1992)).

The absence of probable cause is thus essential to each of Plaintiff's state and federal claims. *See id.* at *3 (reviewing federal and state claims for false arrest and malicious prosecution). Plaintiff asserts Roberson violated his constitutional rights by (1) detaining him for field sobriety tests without a reasonable suspicion he was impaired, and (2) arresting him based on field sobriety

---

[1] The Complaint does not reference Tennessee law, but was filed in Knox County Circuit Court. Plaintiff's brief indicates he is pursuing both state and federal claims. (Doc. 19 at 20).

7

tests which were insufficient to provide probable cause. In the Motion, Defendant argues he had probable cause to make the arrest and is entitled to qualified immunity. Plaintiff disputes Defendant's entitlement to qualified immunity, arguing his actions were objectively unreasonable in light of clearly established constitutional rights.

### A. Probable Cause

"An officer has probable cause when 'the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed.'" *Miller v. Sanilac County*, 606 F.3d 240, 248 (6th Cir. 2010) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). "[W]hether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law. Put differently, state law defines the offense for which an officer may arrest a person, while federal law dictates whether probable cause existed for an arrest." *Scheffler v. Lee*, 2018 WL 4849690 *3, --- Fed. App'x --- (6th Cir. Oct. 5, 2018) (quoting *Kennedy v. Villa Hills*, 635 F.3d 210, 215 (6th Cir. 2011)). Tennessee law prohibits operation of any vehicle subject to registration on the public waters of the state while under the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system. T.C.A. § 69-9-217(a). Subsequent evidence "does not vitiate the probable cause established by what the officer observed and the results of the field sobriety tests," but can cast doubt on an officer's claim that the plaintiff failed field sobriety tests. *Miller*, 606 F.3d at 248 (punctuation omitted).

The United States Court of Appeals for the Sixth Circuit has provided considerable guidance regarding the lawfulness of an arrest for driving under the influence that arises out of a routine traffic stop. Because the issue is so fact-intensive, a review of the cases considering probable cause in this very similar context is appropriate. First, in *Miller v. Sanilac County*, the officer stopped a vehicle that had been going around 60 mph and slowed to 30 mph to run through

a stop sign. *Miller v. Sanilac County*, 606 F.3d 240, 245 (6th Cir. 2010). The parties disputed several facts, including whether the plaintiff was wearing a seatbelt and whether he stopped immediately after the officer activated his lights. *Id.* The officer claimed to have detected a slight odor of alcohol coming from the vehicle and noted the driver was using a state-issued identification due to a prior drunk driving arrest. *Id.* The defendant officer administered five field sobriety tests, including asking plaintiff to recite the alphabet, walk a straight line, touch his fingertips to his thumb, touch his nose, and count backwards from 54 to 43. *Id.* The officer determined plaintiff failed four of the five tests but did not inform him. *Id.* at 245-246. The driver initially refused a blood test because he did not trust the officer but later agreed to it. *Id.* at 246. The officer arrested the plaintiff for a 0.02% blood-alcohol-no-tolerance-law violation. *Id.*

In the suit that followed, plaintiff alleged the officer lacked probable cause to arrest him based on the undisputed facts, and the Sixth Circuit agreed. *Id.* at 245. The Court reasoned that plaintiff's 0.00% blood alcohol level cast doubt on the officer's claims that plaintiff smelled of alcohol and failed the field sobriety tests. *Id.* at 248-49. The Court held that a reasonable jury could conclude, in light of the blood alcohol test results and the plaintiff's testimony, that the officer "was being untruthful generally about his observations and did not have probable cause to believe Miller was drinking." *Id.* at 249. The Sixth Circuit concluded that whether or not the officer reasonably believed the arrest was lawful was a genuine issue of material fact to be submitted to the jury. *Id.* at 248.

Several years later, the Sixth Circuit applied the principles set forth in *Miller* to a Fourth Amendment case that included police footage of the traffic stop and field sobriety tests. *Green v. Throckmorton*, 681 F.3d 853 (6th Cir. 2012). In *Green*, the driver was traveling on wet roads with high beams on and failed to dim them when she approached oncoming traffic, which included a

state highway patrol trooper. *Id*. at 856. The driver also crossed over a shoulder lane marker while turning onto an exit ramp, at which point the trooper activated his lights and she pulled over immediately. *Id.* During the interaction that followed, the officer noticed that her pupils were abnormally constricted. *Id.* at 857. The driver had her purse in her trunk and exited the vehicle to retrieve it, at which point she either forgot to remove her seatbelt or became entangled in it. *Id.* The trooper then asked if she had had any alcohol or taken any drugs or medications, and she responded she had not. *Id.* He immediately began conducting a series of field sobriety tests, which were also recorded. *Id.*

He began with the HGN test, instructing Green to follow the tip of a pen, but Green was unable to follow it when he began moving it. *Id.* at 857-58. She indicated she was tired, and he then administered alphabet and counting backwards tests, a one-leg stand test, and a walk-and-turn test. *Id.* at 858. Determining she had performed poorly on the tests, he placed her under arrest. *Id.* at 859, 865.

Green brought suit alleging the trooper lacked probable cause to require her to submit to field sobriety tests and lacked probable cause for her arrest, in violation of her Fourth Amendment rights. *Id.* at 856. The district court granted summary judgment to the officer. *Id.* Relying on *Miller*, the Sixth Circuit reversed. *Id.* The Court first determined probable cause existed as to the initial traffic stop, but that the defendant did not have a reasonable suspicion of more extensive criminal conduct to justify further detention for field sobriety tests. *Id.* at 860-861. Looking for "a particularized and objective basis for suspecting legal wrongdoing," *id.* at 860, the Court focused first on the trooper's testimony that plaintiff's pupils were constricted. *Id.* at 861. As in *Miller*, the Court found the blood-alcohol results called into question the officer's credibility, leaving only "somewhat vague claims of Green's confusion and her slow reaction times, plus two traffic

violations." *Id.* at 863. Taken together, these factors amounted to no more than a "hunch," not the specific and articulable facts required to warrant further intrusion on plaintiff's liberty. *Id.*

The Court further found the trooper lacked probable cause for her arrest because, based on its review of the recording, plaintiff "completed several of the tests without any apparent difficulty and others with only minor mistakes." *Id.* at 865. "Because reasonable jurors could interpret the video evidence differently," the probable cause and qualified immunity issues had to be submitted to a jury. *Id.* at 865-66.

By way of comparison, the Sixth Circuit found probable cause did exist for the arrest in *Kinlin v. Kline*, 749 F.3d 573 (6th Cir. 2014). In *Kinlin*, a trooper observed the plaintiff signal a left turn and immediately move into a narrow space between two cars in the left lane of a four-lane street. *Id.* at 574-75. The trooper initiated a stop and asked the driver if he had been drinking that evening. *Id.* at 575. He indicated he had two beers. *Id.* Emerging from the vehicle, the driver looked somewhat disheveled but not off balance. *Id.* The trooper attempted to conduct field sobriety tests, but the driver refused. *Id.* The trooper informed the driver that he was under arrest, and then asked two more times if the driver would submit to field sobriety tests. *Id.* The driver refused both times. *Id.* The trooper then again told the driver he was under arrest, that he could smell alcohol, and that the driver's eyes were glassy. *Id.* When the driver's blood test revealed a .012% alcohol content, well below the legal limit, he sued the officer, contending he did not have probable cause to initiate the traffic stop or arrest him. *Id.*

Relying heavily on plaintiff's refusal to submit to field sobriety testing, the Court concluded probable cause existed for the arrest. *Id.* at 580. The Court turned first to *Green*, reasoning that if failing three sobriety tests, standing alone, was insufficient to support a finding of probable cause, failure to submit to such tests, without more, could likewise not provide

probable cause. *Id.* The Court was persuaded that "refusal to submit to a field sobriety test, combined with evidence of alcohol consumption, could give rise to probable cause sufficient to arrest a driver for driving under the influence of alcohol." *Id.* In *Kinlin*, the plaintiff did not dispute that he made a lane change with two feet of clearance, smelled of alcohol, admitted to drinking, and refused a field sobriety test three times. *Id.* at 580. Distinguishing the case from *Green* based on the admitted smell of alcohol and admission of consumption, the Court held that probable cause existed as a matter of law and affirmed the judgment of the district court. *Id.* at 580-81.

Finally, the Sixth Circuit has noted that "additional evidence" usually exists "to bolster the presumption that less-than-satisfactory performance on field sobriety tests indeed was indicative of intoxication or impairment." *Thibault v. Wierszewski*, 695 F. App'x 891, 896-97 (6th Cir. 2017) (reviewing cases cited by defendant regarding officers' reliance on field sobriety test performance). With this guidance in mind, the Court turns to the facts of the instant case.

1. *Initial Detention for Field Sobriety Tests*

There is no dispute that a navigational light was out on Wykle's boat and that this infraction was sufficient to provide probable cause to initiate the stop of the vessel. (Doc. 19 at 14); *see Green*, 681 F.3d at 860 (an officer may lawfully stop and detain a motorist as long as the officer had probable cause to believe the motorist violated a traffic law). What is disputed is whether Defendant had a reasonable suspicion that Plaintiff had engaged in more extensive criminal conduct sufficient to warrant further detention and field sobriety testing. "[P]robable cause to detain a motorist for one violation of the law does not ordinarily provide probable cause to detain the motorist for another violation." *Green*, 681 F.3d at 860. "Thus, 'once a stop begins, . . . detaining the motorist any longer than is reasonably necessary to issue the traffic citation requires reasonable suspicion that the individual engaged in more extensive criminal conduct." *Id.* (quoting

*U.S. v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010)). "Although less demanding than the probable-cause standard, the reasonable-suspicion standard still requires more than a mere hunch." *Id.* (punctuation omitted). In determining whether a reasonable suspicion of criminal conduct exists, courts "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Id.*

A genuine issue of material fact exists as to whether Defendant had a particularized and objective basis for suspecting Plaintiff was boating under the influence and detaining him for field sobriety testing. Roberson testified he directed Blakemore to his patrol boat for further testing because he had "indicators of impairment, admission to drinking, odor of alcohol, open container" as well as "a few indicators from the alphabet as well as the backwards count." (Doc. 19-10 at 27). The Court considers each of these five purported bases – indication of impairment, odor of alcohol, open container, informal test performance, and admission to drinking – in the light most favorable to the Plaintiff and, where possible, in the light depicted by the bodycam footage of the event.

First, Defendant conceded there were no physical indicators about Plaintiff that led him to believe he needed to investigate further (Doc. 19-10 at 27-28), and there was nothing about the way he was operating the boat that indicated impairment. (Doc. 19-10 at 6). This testimony contradicts the account of the stop Defendant initially provided in his undated Report Summary. In the Report Summary, Defendant writes, "[d]uring the stop, the operator appeared to be under the influence of alcohol and/ or drugs." (Doc. 14-3 at 40). The recording does not bear out this observation. Plaintiff walks up narrow stairs without swaying or stumbling. (Doc. 20 at 20:17). He speaks clearly and normally and does not slur his words. (*Id.*).

Next, Plaintiff disputes that he, the boat, or other occupants smelled of alcohol. (Doc. 19-1 at 1; Doc. 19-2 at 1). Defendant's Report Summary also makes no mention of an odor of alcohol,

a noticeable omission in light of Defendant's testimony that it was one of only two reasons he boarded the boat to begin with. (Doc. 14-3; Doc. 19-10 at 6-7); *see Gray v. Hatfield*, No. 1:16-cv-999, 2018 WL 3819031, 8-9 (S.D. Ohio Aug. 10, 2018) (incident report omitted factors officer later claimed to have relied on in initiating stop, raising credibility issues and, with factual disputes, precluding summary judgment as to reasonable suspicion). The other reason was a glass that "appeared to be an alcoholic beverage." (Doc. 19-10 at 7). Once aboard, Defendant abandoned both lines of investigation, though in close proximity to Plaintiff and the glass. (Doc. 19-10 at 7, 31-32; Doc. 20 at 20:15). He never identified the origin of the alcohol odor he had previously detected, (Doc. 19-10 at 14), but testified he did not recall any odor of alcohol coming from Plaintiff at any time. (*Id.* at 14, 42). The video shows Defendant and Plaintiff in close proximity numerous times during their initial interaction and the field tests. Officer Julian, who was also on or very near Wykle's boat and Plaintiff, did not recall smelling alcohol. (Doc. 19-9 at 2).

Likewise, though Defendant insists on referring to the glass in the operator's area as an "open container," he did not investigate the glass, ask what it was, test it, or make any effort to determine what it contained. (*Id.* at 7, 28-31); *see Burleigh v. Detroit*, 80 F. App'x 454, 460 (6th Cir. 2003) ("[O]fficers, in making probable cause determinations, should consider all relevant evidence (including exculpatory evidence) and must investigate further if all of the evidence does not show probable cause."). He recalls it was a brown-ish liquid, but the video footage shows it was clear liquid or ice. (Doc. 19-10 at 30-31; Doc. 20 at 20:16). This is consistent with Plaintiff's indication that he had a glass of water with him in the operator's area. (Doc. 19-1 at 1). Though Defendant testified to multiple open containers and multiple people consuming (Doc. 19-10 at 3, 14), he also testified that he did not recall seeing any bottles, cans, or other alcohol on the boat. (*Id.* at 28-29). He further testified he only remembered one open container for sure. (*Id.* at 28).

Plaintiff and his wife assert there were no open alcoholic beverages on the boat during the boat ride. (Doc. 19-1 at 1; Doc. 19-2 at 1).[2]

Fourth, Defendant claims Plaintiff made mistakes when asked to recite the alphabet without singing and count backwards from 89 to 65. (Doc. 19-10 at 19, 21, 27). Defendant indicates Plaintiff sang the alphabet and repeated a few letters, and hesitated on a few numbers and continued past 65. (*Id.* at 18-19, 21). A reasonable juror viewing the footage could determine Plaintiff performed the requested tasks adequately based on the instructions he heard. The video shows Plaintiff looked briefly at his phone after walking up the stairs, at which point Defendant began speaking again. (Doc. 20 at 20:17). It is not clear that Plaintiff heard the beginning of Defendant's sentence, in which he instructed him not to sing. Plaintiff can be heard slightly singing the alphabet and repeats letters once. (*Id.*). Similarly, Plaintiff counted backwards readily, hesitating on a few numbers and continuing past 65. (*Id.* at 20:18). He was not, however, told to stop at 65 and his cadence and gestures could be interpreted as an attempt to indicate he could easily continue the task. (*Id.*). Defendant interpreted Plaintiff's recitation as a "noticeable change in tempo" (Doc. 19-10 at 22), but this change, too, could be seen as an intentional alteration for effect, rather than a pause due to confusion. Defendant testified he was not aware of any scientific basis for either test and relied on them based on his experience. (*Id.* at 18, 22-23). In light of his failure to investigate potentially exculpatory evidence and the inconsistencies in his accounts of the incident, a reasonable juror could discredit Defendant's personal observations of Plaintiff.

Fifth and finally, Plaintiff did admit to drinking two beers "earlier." (*Id.* at 20:17). He later stated it was during halftime, but Plaintiff did not provide that information to Defendant when he asked Plaintiff to submit to field sobriety testing. (*Id.* at 20:32). This admission is the only

---

[2] Wykle's testimony indicates there was alcohol down in the cabin, but he was not sure if it was open or not. (Doc. 14-5 at 5).

undisputed fact relative to the reasonable suspicion inquiry. The video is subject to interpretation as to Plaintiff's performance of informal alphabet and counting tests and the remaining factors are disputed and turn on credibility determinations. *See Green*, 681 F.3d at 862-63 (video did not support officer's account and credibility determinations precluded summary judgment). These disputes are due at least in part to Defendant's own failure to investigate the suspicions he claims he relied on in detaining and then arresting Plaintiff, namely, the odor of alcohol and alcoholic beverages on the boat. In light of the factual disputes and credibility issues presented, Plaintiff's admission to drinking two beers some time earlier in the day is insufficient to establish, as a matter of law, that Defendant had a reasonable suspicion that Plaintiff was impaired.

2. *Arrest for Boating Under the Influence*

Plaintiff also challenges the lawfulness of his arrest for boating under the influence, arguing that Defendant lacked probable cause to believe he was boating under the influence of drugs or alcohol. Defendant argues he had probable cause to arrest Plaintiff based on (1) the odor of alcohol, (2) the presence of an open container near the operator's area, (3) Plaintiff's failure to accurately recite the alphabet without singing and count backwards from 89 to 65, (4) his admission to drinking, and (5) his poor performance on the seated field sobriety tests. (Doc. 15 at 7). After his detention but prior to his arrest, Plaintiff clarified that he drank the two beers at halftime of the football game that started five hours prior to his arrest, at 3:30 p.m. (Doc. 20 at 20:32). Having addressed the first four factors, the Court turns to the field sobriety tests.

The video footage of the incident raises legitimate questions as to Defendant's administration and scoring of the field sobriety tests. "[I]t is clear that a defendant . . . who is seeking to rely upon the results of field sobriety tests to establish probable cause for an arrest, must establish that the tests were administered properly and that the results of the test clearly

demonstrate the arrestee's intoxication or impairment." *Thibault v. Wierszewski*, 695 F. App'x 891, 898 (6th Cir. 2017). First, the field sobriety tests in this case do not appear to have been conducted in an appropriate environment. Though there is no expert evidence before the Court, Defendant submits the Student Manual of the National Association of State Boating Law Administrators in support of his chosen testing and methods. (Doc. 14-6). The manual states:

> The seated battery must be administered while providing a reasonably safe and stable environment for the subject and the officer. It is recommended to administer the seated battery in calmer waters, i.e. backwaters, coves, bays, or stabilized on the shoreline in a location that minimizes significant boat movement.

(Doc. 14-6 at 49). Here, the boat appears to have been in relatively open water. (Doc. 20 at 20:25-20:27, 20:30, 20:32, 20:37). It visibly rocks several times during and after the tests, (Doc. 20 at 20:26-20:27, 20:30, 20:32), and other boats can be seen and heard nearby. (Doc. 20 at 20:25, 20:37). Plaintiff can be seen grasping the seat on either side while the boat rocks after the HGN test and again after the Hand Coordination test. (Doc. 20 at 20:26; 20:32).

Moving to the HGN test, the flashing lights of the patrol boat appear to have been on while the HGN test was administered. (Doc. 20 at 20:23). A HGN test "involves moving a stimulus from side to side while the subject follows it with her eyes." *Green*, 681 F.3d at 857. The purpose of the test is to check the person's ability to follow instructions and to detect involuntary jerking of the eye, or nystagmus, commonly indicative of impairment. *Id.* When asked about the administration of the HGN test, Defendant indicated that "lights are distracting and can cause the possibility of nystagmus," specifically flashing or strobing lights. (Doc. 19-10 at 32-33). It appears he believed he turned them off, [3] but flashing lights are clearly visible both during and after the HGN test.

---

[3] In a somewhat confusing exchange, counsel for Plaintiff asked when Defendant or Officer Julian turned the lights on the boat "on." Defendant indicated he would have done so prior to administering the HGN test because lights are distracting and can cause nystagmus. In context, it seems clear that Defendant was referring to turning lights *off* so as not to interfere with the HGN test, rather than offering that he turned them knowing they could interfere with the test. (Doc. 19-10 at 32-33).

(Doc. 20 at 20:23). Plaintiff is not in frame during the entire recording of the HGN test, but "distinct and sustained" nystagmus is not visible at any time. (Doc. 19-10 at 33-34).

In the Finger to Nose test, nine or more "clues" is correlated with impairment. (Doc. 19-11 at 4). Defendant instructed Plaintiff to touch his nose with his fingertip when Defendant said "right" or "left" and immediately bring his hand back to his side. (Doc. 20 at 20:27). Defendant scored Plaintiff as exhibiting ten clues, five of which were for not bringing his hand to his side. (Doc. 19-11 at 4). The video suggests Plaintiff either did not hear or did not understand that he was to bring his hand down to his side immediately, as he left his fingertip on his nose in between each instruction of "right" or "left." (Doc. 20 at 20:27). He also left his fingertip on his nose after he completed the test, straightening his head and opening his eyes only after Plaintiff told him he could do so. (*Id.*).

In the Palm Pat test, Defendant instructed Plaintiff to pat his hands, counting aloud "one two one two" as the palms touch, and to speed up as he went. (*Id.* at 20:29). Defendant scored Plaintiff as having started at the wrong time when the video makes clear Plaintiff was seeking confirmation that he understood the instructions. (D0c. 20 at 20:29; Doc. 19-11 at 5). Defendant knew Plaintiff was asking a question and not starting the test, as Plaintiff said "Is that it?" and Defendant responded by asking if he needed to repeat the instructions. *Id.* Plaintiff performed the test for 4-5 seconds before Defendant instructed him to speed up. (*Id.* at 20:30). Defendant scored Plaintiff as failing to increase his speed, for a total of four clues on a test requiring two or more to indicate impairment. (Doc. 19-11 at 5). The entire test took 8-9 seconds. (Doc. 20 at 20:29).

In the final test, the Hand Coordination test, Defendant scored Plaintiff as exhibiting two clues where three were required to indicate impairment. (Doc. 19-11 at 5). The video shows Defendant gave the instructions over the noise of a passing boat. (Doc. 20 at 20:30).

Viewing the video, a reasonable jury could conclude Defendant administered the field sobriety tests improperly and scored Plaintiff's performance inaccurately. *See Thibault v. Wierszewski*, 695 F. App'x 891, 904 (6th Cir. 2017) ("Even after the tests were administered, a jury could conclude, after watching the video . . . that the tests were not administered properly and that [plaintiff] nevertheless completed the tests satisfactorily."). No law enforcement officer can be expected to assess every individual's sobriety or impairment with perfect accuracy. "Yet officers do not have free rein to administer field sobriety tests to whomever they please and then arrest that person for making the slightest misstep while performing the tests." *Green*, 681 F.3d at 866-67. The Court cannot say, as a matter of law, that Defendant had probable cause to arrest Plaintiff for boating under the influence based on the field sobriety testing depicted in the video and Plaintiff's admission to consuming alcohol several hours earlier. "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Kinlin v. Kline*, 749 F. 3d 573, 578 (6th Cir. 2014) (*quoting Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995)). With multiple reasonable interpretations, the issue of probable cause must be submitted to a jury.

### B. Qualified Immunity

For the same reasons, Defendant is not entitled to summary judgment based on his assertion of qualified immunity. "Qualified immunity is a doctrine that 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Green*, 681 F.3d at 864 (*quoting Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "[W]here the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Id*. (*quoting McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir. 2010). A reasonable jury

could find Plaintiff did not appear to be impaired during the stop, that his minor errors on the alphabet and counting tests were not indicative of impairment, that there were no open containers on board the boat, and that Defendant never smelled alcohol and inaccurately scored the field sobriety tests. "On these facts, [Defendant's] conduct would be 'plainly incompetent' and thus strip him of qualified immunity." *Id.*; *see also Gray v. Hatfield*, 2018 WL 3819031 at 9 (factual disputes and credibility issues prevented finding as to reasonable suspicion to detain plaintiff, precluding a finding that officer was entitled to qualified immunity). Because the reasonableness of Defendant's conduct in detaining Plaintiff for field sobriety tests and subsequently arresting him depends on disputed facts and credibility determinations, summary judgment is inappropriate.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 14) is **DENIED**.

**SO ORDERED** this 23rd day of September, 2019.

_____
**CHIEF UNITED STATES DISTRICT JUDGE**